Government Employees Insurance v. Mayzenberg If it may please the court, good morning. My name is Matthew Conroy. I represent the defendant appellants in this matter, Dr. Mayzenberg and his professional corporations. This appeal whether or not the lower court was correct in expanding the scope of the Malala defense doctrine within New York No Fault. And in order for the court to properly evaluate whether or not Judge Glasser was correct or incorrect in making that expansion, the court need look no further than the two seminal cases from the court of appeals in evaluating whether or not the rule as promulgated by State Farm v. Malala, which essentially is that insurance companies like GEICO are able to look beyond facially valid incorporation documents to determine whether or defendant medical providers are in compliance with local and state licensing laws, can be expanded to include other types of violations such as the public health law or the education law, such as in this case where there are allegations of kickbacks or fee splits or other types of speak to this. One arises from the Eastern District from a decision of Judge Sifton, which resulted in this court certifying a question to the court of appeals. In the particular language in the question and ultimately in the court of appeals ruling is instructive to this court on whether or not in this case it's appropriate to expand the doctrine to include disciplinary violations as opposed to structural corporate licensing laws. Do you think certification would be helpful in this case? Perhaps, Your Honor, and the reason why I would say it wouldn't be helpful is because I don't think it's a close call. I think Malala is so clear about what it means and what it's for, which is even further amplified in the Carruthers decision, which was only five years ago, where the court essentially says that the issue for the defense is whether or not the defendants are in compliance or violation of foundational rules of corporate licensure. The rules suggested in this case that are violated, meaning the education law and the public health law as to fee splits and kickbacks, those are not corporate licensing rules. Those are simply things that raise the same policy problems as having non-medical personnel have an ownership interest. They're giving a financial interest in the way the practice operates to people outside the medical professions. I agree, Your Honor, in part with the first part of what you said. I agree, especially as it relates to these facts in this case, and I'll tell you why. The argument that GEICO has made essentially is that the kickback or fee split arrangement gets you to the same result as lay ownership of a professional corporation. Yeah, it gets you to the result that hundreds of thousands of dollars are coming out of the medical practice and going to the non-doctor Dovman. I mean, it looks to me like they might have had a theory. I think it would have been harder to prove, but they might have had a theory that he was really a hidden owner because why else is all this money going there? Let me demonstrate for you, Your Honor, why that's not true. The language that the plaintiffs used in their brief was that, and this is from page 28, instead of overcharging the defendants for equipment and management fees, like Carruthers, the Dovmans charged for patients which allowed the same level of influence and control over the defendants, and I think that resonates with what Your Honor just said. And as you put it, doesn't that also establish that in Carruthers, the New York Court of Appeals was already moving beyond the specific facts of Malala to a situation where the practice was being overcharged for medical equipment? Yes. But the facts are important. In Carruthers, the lay people owned the MRI facilities. There were three of them. They owned the machines, they owned the space, they charged Dr. Carruthers $577,000 a month for that. The difference in the fair market value, according to the experts, which was before the jury, was a difference of $4.6 million. The financial expert in that case concluded that the lay people obtained $12.2 million from the practice while Dr. Carruthers earned $133,000 per year. Juxtapose that with what we have in this case. You have a practice that generated $5 million over the course of six or seven years. Out of $5 million, $390,000 went to the Dubman entities. That's 8%. It's not even close. Nor is there any evidence in the record at any point in this case that the Dubmans had any influence or control over anything that happened in the office with billing, with collection, with the lawyers, with the patients. There's simply none. The case is based on the fact that we have this money, which over an 18-month period went from the Mazenberg practice to the Dubmans. If that was for referrals, then Mr. Mazenberg could lose his license as a consequence. Perhaps, but- He has not, of course. Dr. Mazenberg's deposition testimony is that it was less than artfully spoken that he believed he was paying for marketing and advertisement in whatever form that that took. He believed he was getting a garbage company to, as he put it, if they found some customers in the garbage cans and referred them to him, that's what he was paying for. You really can't defend, it seems to me, the argument that this was for marketing and advertising in any other way, shape, or form than marketing in the form of sending a referral, since there is no evidence of any kind of advertising or any kind of marketing that any of the people who received the kickbacks provided. Your Honor, for purposes of the argument, the primary issue to be determined, I'm not conceding that he paid kickbacks, but the larger question and the important question is whether or not these types of violations render the professional corporation ineligible for reimbursement. And that is a question for you, Your Honor. I mean, the language of the regulation is whether these are licensing requirements as opposed to disciplinary infractions. Though, circling back, I mean, it's hard not to say refraining from accepting kickbacks isn't necessary to be eligible to receive no-fault, because you're going to lose your license, presumably, eventually. There's a legal and a practical reason why the argument ultimately fails. As the language goes, the statute is 65-3.16812 of the New York Recs, and it says that a provider of healthcare services is not eligible for reimbursement in no-fault if the provider fails to meet any applicable New York state or local licensing requirements necessary to perform such services in New York. That question appears in Malala, but is clarified in Carruthers, where they use the language, it is the foundational rule of professional corporate licensure that has to be violated. To expand that beyond the corporate structure to include conduct of people that are working for or around the company opens up an enormous amount of potential violations that would, one, bog down the industry, but potentially render a company's ability to treat patients and collect on those patients, it would be mired for years. You know, at what limit, you know, what limit do you put on this? Is it just fee splits? Is it over-utilization? Is it, you know, sort of technical violations of putting signs up on the wall where you disclose who the doctor is at a particular location? You know, there's an entire sort of universe of rules and regulations that the public health law and the education law addresses, and those are things that OPMC and OPD, you know, the sort of disciplinary bodies that govern the practice of healthcare in New York, you know, that's their job to enforce those things. If, you know, as Malala and Carruthers are interpreted by the of the company itself, that's easy to understand. If you were only controlled by a layperson, you simply don't... The court said, well, it's not everything that goes to that issue. That's not exactly, that's not one aspect of it. It's what's fundamental, and the court presented an argument not dissimilar to the one you're making now, that if you go down this road, then every little violation of the technical requirements of maintaining your professional corporation status would be a problem, and the court sort of said, no, not really. It's when it amounts to a substantial kind of violation. Right, and that's, and the examples they gave were failure to hold annual meetings, failure to pay corporate filings, failure to submit something timely, you know, those are all violations, but they're not, as Carruthers would speak to, foundational. So if the rule from Malala, and the exceptions from Malala, and then the clarification by Carruthers simply addresses foundational corporate structure issues, I don't think it was appropriate for the district court here to expand that to include these other types of violations. Well, appropriate. What you're saying is, and not too far to point on it, is there's a difference between licensing requirements and violations of professional rules that apply to someone who holds that license. That's the simple line you're trying to draw. It is, it is, and it's a line that's supported by the two seminal cases from the case on their face give the impression that there were a lot of patients and a lot of money. And just for purposes of simple math, over the course of six or seven years, my clients treated 1,390 GEICO patients. It sounds like a lot, but that's three different locations over six years. That would result in roughly, if we do the math, six to seven patients per month at each location. Not overwhelming when it's seen in that context. So on the face of it, in the briefing, it appears as though there was a lot of treatment and a lot of patients, but I'm simply pointing out that if you reduce it down to the span of time, the number of practices, the number of acupuncturists, it's simply not that much. Lastly, again, I would simply direct the court to look at Carruthers. And Carruthers doesn't change Malala in any substantial way. The real holding of Carruthers, which isn't particularly material to this case, was that the fraudulent incorporation language that's used in Malala was derived from the question that was certified from this court. And Carruthers ultimately said, it's not fraud in the sense of fraud. It's fraud in the sense that the corporation was not eligible because it wasn't in compliance. And the fraud elements of Intent Sienter don't necessarily apply to something that was sent to or submitted to the Department of State, but rather the fact that in any particular bill that was submitted to an insurance company, the misrepresentation would be that they knew that that professional corporation was not eligible at the time. That's important for this case because if the intent for purposes of the fraud is that the owner knows that the structure, that's a very different situation than in this case where you have allegations that kickbacks or fee splits were made in a very finite period of time, yet it will, it would potentially have the effect of rendering the PC ineligible for all time, which essentially is what Judge Glass have found here. I thank you, your honors, very much for your attention. Morning, your honors. Barry Levy for Government and Plays Insurance Company. I kind of find it interesting that Mr. Mazenberg starts off with a proposition that there's some logical distinction between the Malala Doctrine as it was originally created and what happened in this particular case because we're talking about a system in which guardrails were created as a result of the adoption of the regulation in 2002 that talks about these licensing requirements, and the term licensing requirements isn't defined in the regulation in any particular way, but the way it's been applied in the context of these cases originally in Malala and subsequently in I had the opportunity to argue before the New York Court of Appeals, makes a very fundamental, very fundamental point, which is that when healthcare professionals are influenced by non-healthcare professionals in the way that they treat patients, they create fundamental perverse incentives to do a number of things. One, to create distrust in the no-fault system itself, which is different than most payer systems. Secondly, to act in ways that are inconsistent with what their licenses require in terms of treating the patients, and three, for financial incentives. All of those things are present here. They were present in Malala, they were present in Carruthers, and they're present here. Can I shift? I totally understand the sort of policy resonance between what they were talking about in Malala and Carruthers. I want to sort of get into the nits of the statutes themselves and make sure I understand your theory. I understand your theory to be that 3.65, 3.6812, whatever, says you're not eligible for reimbursement for no-fault if you fail to meet any applicable New York state or local licensing requirement necessary to perform services. Under the New York public health law, the penalties for professional misconduct can include license penalties that might impact your licensure in some way, including, I suppose, revoking it, but also other levels. In the New York education law, there are various kinds of professional misconduct defined, and those can, in turn, lead to impact on your licensure, and therefore, violation of those as a statutory matter goes to your licensure. So when I look at the definitions of professional misconduct, obviously there's the facts of this case and the specific scenario, but they don't all, many of them deal with things that have nothing to do with street rights. So on your legal theory, practicing the profession with negligence on more than one occasion, which would amount to professional misconduct and potentially expose someone to the possibility of license impact, would disqualify you from receiving past, present, or future reimbursement regardless of how many patients you treated who needed the care and your very good question. So let me address that from the context of the original Malola decision, and let me bring it forward into the context of this case. So Malola involved a doctor, and so did Carothers, by the way, in relation to the professional corporations that advocated responsibility over the professional corporations to other people. And fundamentally, one of the things that's very important about those cases, as it relates to this particular case, is that in Carothers, the Court of Appeals rejected what was called time of incorporation. So you're not looking at it in the context of, you know, at the time that the professional corporation, at the time that the person went to the Department of State and the Department of Education and said, you know, I'd like to apply for the license and certificate of authority. What you're, what the, what the court has said, and in both Malola and Carothers, consistent with the regulation, is independent of what the regulator may do, what the Department of Education may do, in the context of a corporation, what the Department of State may do, that an insurance company is entitled to look at this conduct. And so in the context of that, what they have said in Malola is, look, not everything, Judge Robinson, is tantamount to fraud. We have to look at the playing on some words that Mr. Conroy used. It's foundational. How fundamental is it that this is something, so for example, in the education law, in the disciplinary section, it talks about if you're convicted of a felony. Well, if a doctor were convicted of a DUI, would that render the professional corporation ineligible for the purposes of providing services? That's not tantamount to fraud. Fraud is what goes to the heart of the services that are being performed, what goes to the creation of the application of control, and what creates perverse financial incentives as far as the treatment is concerned. So the policy undergirding of those decisions now becomes the legal limiting principle in which of these professional conduct requirements amount to licensure violations that can lead you to be ineligible. Is that sort of where you're drawing the line? That's exactly where the line goes, Your Honor, and the reason for that is that's exactly consistent with what they did in Malala. They didn't set a bright line test. They didn't say, okay, this is over the line and this is under the line. It's tantamount to fraud. Well, what's tantamount to fraud? Mr. Conroy suggested that the difference between this case and Malala is an essence control, and I think Judge Lynch pointed out, well, we could have argued that the kickback scheme, one of the things that's very interesting is that there's actually more control on the part of the lay people than there are in the context of a corporate structure of medicine, because as the lay person controlling the pipeline for the patients in exchange for the money, I control the business. You don't pay me, the patients never show up at your location. You don't pay me, you never treat. You don't pay me, you never get to bill. Well, presumably you're not, you're allowed to provide services to people who aren't, you're not paying referral fees to, right? I mean, this is, but once you get into the, once you put your arms in the quicksand, Your Honor, once you knowingly pay for referrals of patients, and by the way, this whole idea about case, Doveman was paid, those companies were paid for patients. They weren't paid for marketing, they weren't paid for advertising. Without that quid pro quo, without that money changing hand, there is no business. It doesn't exist, and this wasn't over a week or over a day, this was over a course of years, and this involved, and if there was nothing wrong with it, if there was no reason to hide this, think about the structure or the manner in which this was done. So, Mr. Mazenberg gets the money from Mingman, he gives it to two corporations which are either defunct or not operable, who then turn around and give this money based on a telephone call that they get every month that says, hey, I want you to send me this amount of money, and I'll sign a blank check, and you just fill in who the recipient of it is? Doesn't that raise at least the prospect that there might be a question as, something's going on, right? I don't think you can say something's not going on. There's clearly money being paid in a way that suggests there's sort of illicit transfers of money, but in order to make your case an effectual matter, those transfers, you have to prove that those transfers have to be for sending patients, rather than some other sort of bribery that might be happening, or money laundering, or illicit activity. But, but, but, but Mazenberg conceded that. He said that in his testimony. Well, conceded is maybe not the exact right word, but he did. He acknowledged it. He acknowledged it. I think that's a better word. He not only acknowledged it, he not only acknowledged it, I think the, the quote that, that Judge Lynch gave is exactly what he said, which is, I don't care if it's a garbage company. If, if that company is sending me patients, then, then I'm paying them. And he wasn't concerned about it. He just, he flat out said, that's fine. He said it several times, but, but, you know, yes, I mean, I, I, I think I would say anyway that you've got the case that that's what that money is going for, because I certainly also thought, well, maybe he's got a drug problem, and he's paying money there. Maybe he's got a he acknowledges essentially enough that I don't have a problem with the sufficiency of your proof on that point. But I, I still want to push back a little bit on what is a licensing requirement. I mean, I think in the vernacular, if I think of getting a driver's license, what are the requirements? I have to be a certain age, I have to be a resident of the state, I have to pass the written test, I have to pass the road test, I have to pass the vision test, and then I get a license. Now after that, there are all kinds of things that I can do with my license that are illegal. I can speed, I can drive recklessly, I can drive drunk, and some of those things could lead to the revocation of my license. But one doesn't normally think of those as licensing requirements. One thinks of those as regulatory violations with respect to the use of the license. But that's why the regulation was adopted to fill the gap, your honor. The regulation was adopted by the Department of Financial Services in 2002, because at the time there was a gap in the system. And it wasn't a regulation that was designed to deal with multiple payer systems. It doesn't deal with Medicare. It doesn't deal with Medicaid. It doesn't deal with commercial health insurance. It deals with no-fault. And the reason it deals with no-fault is because the volume of fraud that exists in no-fault is unbelievable. All you have to do is look at the docket in the Eastern District of New York. It's Brooklyn and Queens. It's like ground zero. And if you look at the criminal prosecutions that have come about in the last four or five years from the U.S. Attorney's Office involving Bradley Pierre, Weiner, Rose, okay, just to name a few, Bogaraz, Danilovich, which is a case that was heard before this court about four or five years ago. They all involve kickbacks. So to your point, Judge Lynch, when you talk about the fact that, yes, I have a driver's license and you know, I understand all of this, kickback component of these types of schemes is part of the criminal activity that goes on. And the level of control that it gives, okay, I want to read one point. I'm sorry, criminal activity? What's the crime? No, no, no, I'm saying it's criminal behavior. I'm sorry, not a crime itself, but criminal behavior. He's accepting a referral fee for assuming that, I mean, because we, I think we have to assume for this appeal that these are patients who have bona fide medical needs, that the treatment is appropriate, and that the billing has been commensurate with the treatment. That may not be true on unremand. You could prove it if you, you know. No, but in the context of the crimes that have been charged in the districts, the kickbacks are part of the scheme related to the insurance fraud aspect of the of the crimes charged. And all I'm saying is that it's, this is behavior that goes on that promotes a whole course of conduct. And this is, by the way, the payment of these kickbacks in the context of this, this is the business model of the way that Mr. Mazenberg acted. This wasn't some just one-off situation. This is the way he did business. So, but I'm, you keep referring to that as fraud, right? And one of the things I'm trying to understand is, I totally understand the argument, I may not agree with it, but I understand it, that accepting referral fees for referring bona fide patients with bona fide medical issues for whom you provide bona fide treatment is not permitted under the professional conduct rules in place. But if, in fact, they're bona fide patients with bona fide needs, and you're providing bona fide medical care, why is billing the insurance company for those fraud? For the same reason that in Malala, in Malala, if you go back and you read Malala, your honor, State Farm stipulated that all the services were bona fide. State Farm stipulated that all the health care practitioners who provided the services have licenses. That they were within, the services were provided within the scope of their licenses. And the reason for that is because the regulation takes that issue to another level. And it says, no fault is a payer system, and it creates perverse financial incentives. So if health care providers act in ways that's inconsistent with what the licensing requirements are, that that creates an ineligibility issue that goes beyond the delivery of the services. And the reason for that is set forth in Carruthers. It says really very simply, it says that these types of issues create ethical conflicts and undermine the quality of care afforded to patients. And then it goes on to say that these types of issues, okay, lead to higher costs, less effective medical treatment, and mistrust of the no-fault insurance system. Right. No, and again, I understand your policy argument. But the policy argument ties into the regulation and why the regulation sits above. Right, but now we're talking about fraud. And fraud includes Santer. Right. Right? And so now we have a theory that fee splitting is a license violation that just qualifies you for no fault. It's a theory that's been rejected by most New York courts that have addressed it. How could you have Santer? This is not a- Let me just finish my question. I want you to finish your question. Sure. I apologize. Yeah. It's a theory that's been rejected by every New York court, I think, but one that's addressed it. So how could someone have Santer and tell the laws established that submitting those bills is fraud? Thank you. There's a difference, Your Honor, between a fee split and a kickback. If you go back and you read the case, the only appellate division case in New York that exists, which is called New Wave Massage, okay, that case involved a situation where the healthcare provider paid the billing company 5% of the billed amount to the company to send the bills out for an acquisition. In that particular case, that was probably a little on too far, and that's not on this side of the line. Go back to what I suggested before, which is the tantamount to fraud test, which is what Malala says. How does paying a billing company 5% of the collections that it receives on billings that go out create any perverse incentive as far as the care of the control over the professional entity? It doesn't. That's the only case in New York that specifically deals with the fee split. This is not a fee split. This is a kickback, and that's a different part of the- Can I ask whether you think that we might be helped by certifying a question to the New York Court of Appeals? I take the same position that Mr. Conway does, but the opposite side of it, Your Honor. I don't think that within the context of the structure of Malala and Carruthers, I think this is an easy question to answer. You both think this is an easy question. And I appreciate it, but obviously, I appreciate the Court's view, and I understand that this, the issue has never come before this Court or the New York Court of Appeals. But if you look at fundamentally the public policy issues as they relate, the evolution of the regulation and the structure that Carruthers and Malala creates for these types of issues, I think this case can be answered on the basis of that. But obviously, if the Court feels certification is warranted, you know, we would understand. Unless the Court has any other questions, I thank you very much for your time. Thank you. I'll be brief. I'd like to just refute two specific things that Mr. Levy said. With respect to the criminal cases that have been before the Eastern and Southern Districts over the last few years, the payment of kickbacks was not a primary activity charged in any of those cases. I was personally involved in many of these cases. And Pierre, for example, and the Gokharov case, which were both filed on the same day in the Southern District, both involved bribing 911 operators, a NYPD highway officer, and they both involved Malala-type allegations of laypeople owning, controlling professional corporations. It was not based on the payment of kickbacks or disguised marketing or things like this. The exchange of money, there were runners involved in those cases. There were staged accidents involved in some of those cases. We don't have staged accidents in our case. We don't have runners in our case. We don't have any of that conduct that you saw in Gokharov, in Danilovich, in Zemlyansky, in Pierre, in Nexley. There are different cases. Your Honor was very astute in pointing out that in New York, the payment of a kickback for a patient is a violation of a disciplinary rule, but not an independent crime under New York law. The Office of Professional Discipline and the Office of Professional Medical Conduct can regulate and bring actions for this behavior as they see fit. But to expand Malala, to include these things, and this ultimately gets back to a question that I failed to answer, for your honor, which is that the practical implication of the expansion of this rule would be that the carriers would dig to every type of conceivable violation of any regulation or law in order to slow down or verify claims, ultimately to deny claims, and potentially ultimately to bring cases like this to claw back money that they previously paid. Mr. Levy pointed out that in the New Way case, the insurance company in that case and their lawyers went too far in asserting that a fee split would be a basis for the denial or verification of a particular no-fault claim, and the court said, no, that's not the type of rule intended by Malala or Carruthers in order to give you a basis to deny the claim or further investigate the claim. So I would simply point out that the guardrails referred to by Mr. Levy in the amended regulation from 2002, as it's been interpreted by both Malala and Carruthers, clearly limit those guardrails to issues of corporate eligibility based on ownership and control of laypeople. There are no cases that expanded further that are precedent to this court or to any other court for that matter. So I would simply close with saying that I think that the court understands our position on the distinction between a corporate foundational licensing rule, which is what's specifically referenced in Carruthers, versus professional discipline rules, which are referenced by the plaintiffs in the complaint and in their briefs. I thank you very much. Thank you both, and we'll take the matter under advisement. Thank you very much.